

# In the
# Missouri Court of Appeals
# Western District

STATE OF MISSOURI, )
)
Respondent, )
)    **WD86611**
v. )    **OPINION FILED:**
)    **AUGUST 26, 2025**
MAGGIE P YBARRA, )
)
Appellant. )

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Joel P. Fahnestock, Judge**

**Before Division Four: Anthony Rex Gabbert, Chief Judge, Presiding,**
**Mark D. Pfeiffer, Judge, Thomas N. Chapman, Judge**

Maggie Ybarra appeals her conviction following jury trial of murder in the second degree, harassment in the first degree, attempted child enticement, first-degree sexual misconduct, tampering with physical evidence in a felony prosecution, and three counts of attempted tampering with a victim in a felony prosecution. Ybarra was tried jointly with a co-defendant. In her sole point on appeal, Ybarra argues the trial court abused its discretion in failing to sever the trial of her case from that of her co-defendant. The judgment is affirmed.

**Facts**

In June 2021, the State of Missouri ("the State") charged Ybarra and a co-defendant ("Co-Defendant"[1]) via indictment either singly or jointly with nine counts. In July 2021, the State charged Ybarra and Co-Defendant via superseding indictment either singly or jointly with ten counts. In August 2021, Ybarra filed a motion to sever her joint trial with Co-Defendant. The trial court denied that motion in August 2021.

In November 2022, the State charged Ybarra and Co-Defendant via superseding indictment with the following:

> I. First-degree murder, section 565.020, "in that on or between October 10 and October 12, 2020, in the County of Jackson, State of Missouri, the defendants, Maggie Ybarra and [Co-Defendant], acting alone or purposefully in concert, after deliberation, knowingly caused the death of [K.A. ("Victim")] by strangling her."

> II. First-degree harassment, section 565.090, in that "Maggie Ybarra and [Co-Defendant], acting alone or purposefully in concert, without good cause, engage in an act with the purpose to cause emotional distress to [K.M. ("Child")] by showing her pictures of a dismembered female body and such act did cause [Child] to suffer emotional distress."

> III. Attempted child enticement, section 566.151, in that [Co-Defendant], "who was twenty-one years of age or older, acting alone or purposefully in concert with others, penetrated the vagina of Maggie Ybarra while Maggie Ybarra asked [Child], a child less than fifteen years of age, if [Child] wanted to know how it would feel for a finger to be placed in [Child's] vagina[.]"

---

[1] Pursuant to Missouri Supreme Court Operating Rule 2.02(c)(3), we do not include names of witnesses other than parties. Co-Defendant is not a party to this appeal. Co-Defendant was also convicted, and has filed his own appeal which is pending in this Court in case number WD86570.

IV. Attempted child enticement, section 566.151, in that Maggie, "acting alone or purposefully in concert with others, asked [Child], a child less than fifteen years of age, if [Child] wanted to know how it would feel for a finger to be placed in [Child's] vagina[.]"

V. Third-degree child molestation, section 566.069, in that [Co-Defendant] "knowingly subjected [Child] who was less than 14 years old to sexual contact by touching the vagina of [Child] over clothing."

VI. First-degree sexual misconduct, section 566.093, in that Maggie and [Co-Defendant], "acting alone or purposefully in concert with others, knowingly had sexual contact with [Co-Defendant] in the presence of [Child] under circumstances in which Maggie Ybarra and [Co-Defendant] knew that such conduct was likely to cause affront or alarm."

VII. Attempted tampering with physical evidence in a felony prosecution, section 575.100, in that Maggie "asked [Co-Defendant] to discard evidence located in her residence[.]"

VIII. Attempted tampering with a victim in a felony prosecution, section 575.270, in that Maggie "instructed a woman to tell [Child] to say that [Child] lied[.]"

IX. Attempted victim tampering in a felony prosecution, section 575.270, in that Maggie "instructed a woman to buy gifts for [Child]"

X. Attempted victim tampering in a felony prosecution, section 575.270, in that Maggie "instructed a man to pressure [Child] to recant[.]"

XI. Possession of child pornography, section 573.037, in that Maggie "knowingly possessed child pornography that was a visual depiction of a person less than eighteen years of age engaged in sexually explicit conduct, consisting of a still image of the genitals of a female child under the age of fourteen."

XII. Possession of child pornography, section 573.037, in that Maggie "knowingly possessed child pornography that was a visual depiction of a person less than eighteen years of age engaged in sexually explicit conduct,

3

consisting of a still image of the genitals of [Child], a child under the age of fourteen."

XIII. Sexual exploitation of a minor, section 573.023, in that Maggie "knowingly created child pornography of a person less than fourteen years of age by creating a still image depicting [Child's] genitals."

The superseding indictment listed 59 witnesses.

In February 2023, Ybarra filed a second motion to sever. The trial court denied that motion in April 2023. It found that Ybarra would not be prejudiced by a joint trial with Co-Defendant.

The case proceeded to jury trial. In the light most favorable to the verdict,[2] the following evidence was presented:

Co-Defendant lived in Grain Valley with his wife and two children. He met Ybarra through an escort service and began a relationship with her. When their relationship began, Ybarra lived in Claycomo next door to Victim. Ybarra often engaged in three-way sexual activity with Co-Defendant and Victim. Ybarra moved from Claycomo to Grandview but the sexual activity with Victim continued.

Ybarra has a biological daughter, Child, who had been given up for adoption. She reunited with Child in August 2020 when the child was thirteen years old. In late 2020, while Co-Defendant was at Ybarra's Grandview home, Ybarra asked Child to put on

---

[2] When reviewing a jury-tried case, "we view the facts in the light most favorable to the jury's verdict." *State v. Warren*, 702 S.W.3d 48, 50 n.2 (Mo. App. W.D. 2024) (internal quotation marks omitted).

lingerie. Child reluctantly did so. Co-Defendant told Child she looked beautiful and told her to get in bed with him and Ybarra.

Ybarra, Co-Defendant, and Child were in bed together watching a scary movie when Co-Defendant said that people dying turned him on. Ybarra and Co-Defendant began having sex with each other. They began touching Child. The sexual activity stopped when Child said she did not want to join Ybarra and Co-Defendant in having sex.

Ybarra told Child that she and Co-Defendant wanted to show Child something. Co-Defendant got a camera, and Ybarra told Child that she and Co-Defendant had killed someone. Ybarra showed Child pictures of a dead woman. Child's later description of the dead woman matched Victim's description. The pictures on the camera included Victim with a bruised face, naked in a box with her arms tied up to her chest by a rope and her knees up. Several other pictures depicted Victim after her body had been dismembered. Ybarra told Child that she, Co-Defendant, and Victim had sex and Co-Defendant choked and killed Victim while they were in bed. Victim's body was placed in a box. It was later dismembered and put in a freezer at Co-Defendant's house. Co-Defendant's wife at the time of the murder testified that a freezer showed up one day in a plane hangar on Co-Defendant's property and that Co-Defendant sold the freezer in April 2021.

Ybarra and Co-Defendant also discussed Victim's murder with Ybarra's mother ("Mother"). Mother testified that Ybarra and Co-Defendant were excited to talked about the murder. Co-Defendant told Mother he had always wanted to do something like the

murder, that Victim's life had not been productive, and that he was thankful that Victim gave him the chance to experience the murder. It took four minutes to kill Victim. Ybarra showed Mother pictures of Victim from the night of the murder. One picture depicted Victim alive with a ball gag in her mouth. Others showed her dismembered body in a freezer. Mother was told that Victim's body was buried on Co-Defendant's property.

In April 2021, Child told her foster care caseworker about her experience with Ybarra and Co-Defendant. The caseworker contacted the police, and Child was forensically interviewed. Child identified Co-Defendant from a photo lineup and described a tattoo on his back.

Victim's remains were found buried outside a bedroom window of Co-Defendant's home. Victim's body was in an advanced state of decomposition, and was found cut into fifteen pieces that had been placed in multiple trash bags. Similar trash bags were found in a hangar on the property. Zip ties, pieces of wood, and Styrofoam found in the hangar were consistent with items found buried with Victim.

A circular saw in a tool box on Co-Defendant's property had blood on it three septillion times more likely to be Victim's blood than blood from an unknown person. A manual for a chainsaw was found, but no chainsaw was found. Co-Defendant's wife at the time had seen a box for a chainsaw in a dumpster on their property. She testified their property was mostly grass and that they did not need a chainsaw.

6

At some point, Ybarra had moved from Grandview to Grain Valley. She was arrested before Co-Defendant. Ybarra called Co-Defendant from jail and told him that he needed to take out the trash she brought with her when she moved from her Grandview home. Police subsequently found lingerie at Ybarra's Grain Valley home that matched the description Child gave. A ball gag was found wrapped in a sheet in the garage. During one phone call, Co-Defendant told Ybarra he was expecting to be arrested.

Co-Defendant's emails revealed that he ordered an Uber in October 2020 for a trip that began at an address associated with Victim and that ended across the street from Ybarra's Grandview home. Victim's phone made two outgoing calls from that area on that day. Ybarra and Co-Defendant's phones were connected to cell towers in that vicinity around that time. Co-Defendant's phone connected with cell towers between Ybarra's Grandview home and his Grain Valley home around that time.

Co-Defendant was associated with an iCloud account. That account included an image of something labeled as "people meat chart." The account included photos of him on a backhoe at his property and of a hole being dug by the backhoe. The photos were uploaded on October 17, 2020. Victim's phone showed activity on October 17, 2020 consistent with it being powered on and then off. Prior to that day, the last activity on Victim's phone was on October 11, 2020.

Co-Defendant's web browsing activity around the time Victim disappeared showed searches on a pornography site for videos using terms that included "behead," "death," "strangle," "murder," "daughter," "snuff," and "necro." Co-Defendant's

7

browsing history showed searches for missing people generally and for Victim's name. A video on his phone depicted Co-Defendant asking his then wife, "Do you think it's possible to stand over someone as they are dying and yell at them?"

Text messages between Ybarra and Mother contained Ybarra indicating that she was setting things up so that no one would believe Child's statements about Ybarra and Co-Defendant. Ybarra accused Child of manipulating Mother. Mother chastised Ybarra for attempting to molest Child with Co-Defendant, and Ybarra did not deny the accusations.

Co-Defendant was convicted on all counts with which he was charged, and was sentenced to consecutive sentences of life without parole for first-degree murder, four years for harassment in the first degree, thirty years for attempted enticement of a child, ten years for child molestation in the third degree, and six months in jail for sexual misconduct in the first degree.

Ybarra was found guilty of Counts I, II, IV, VI, VII, VIII, IX, and X. The jury found Ybarra not guilty of Counts XI, XII, and XIII. Ybarra was sentenced to consecutive terms of life, four years, thirty years, seven years, seven years, seven years, six months, and one year. This appeal follows.

**Standard of Review**

"The decision to sever a joint trial lies within the sound discretion of the trial court." *State v. Mack*, 624 S.W.3d 436, 452 (Mo. App. E.D. 2021) (internal quotation marks omitted). "An appellate court will not disturb that ruling unless there is an abuse

of discretion resulting in prejudice." *Id*. "The defendant on appeal bears the burden of affirmatively showing that the joint trial prejudiced [her] right to a fair trial." *Id*.

Ybarra's point relied on claims the trial court erred in denying her second motion to sever. That motion argued that failure to sever would result in prejudice because: (1) tying count V (third degree child molestation charged against Co-Defendant alone) to Ybarra would cause prejudice due to the nature of the charges and evidence presented to support that charge; (2) Co-Defendant's proffer would not be admissible against Ybarra but is admissible against Co-Defendant as a statement against penal interest and the proffer would violate Ybarra's right to confront witnesses against her; and (3) a separate trial is necessary for a fair determination of whether each defendant is guilty because Co-Defendant is incentivized to be prejudiced against Ybarra and the jury may find Ybarra guilty by association with Co-Defendant. Ybarra's motion for a new trial simply stated that the trial court erred in denying the motion to sever.

In her sole point on appeal, Ybarra argues that the motion to sever should have been granted because the case against her and Co-Defendant involved a large number of charges, witnesses, and exhibits. She states that the State's evidence was not simple and entailed multiple experts to elucidate its complexities for the jury. Ybarra further argues that the number and type of counts alleged and their manner of charging meant the jury could not readily distinguish the evidence and apply it to each offense without confusion.

Ybarra's argument on appeal is different from the one in her second motion to sever; thus, her argument on appeal is not preserved for appellate review. *State v. Dodd*,

9

712 S.W.3d 454, 462-63 (Mo. App. E.D. 2025). "This Court does not generally review unpreserved claims of error." *Id*. at 463. "Rule 30.20 provides an exception allowing that 'plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom.'" *Id*. (quoting Rule 30.20). "Rule 30.20 makes clear that plain error review is a discretionary, two-step process." *Id*. "The first step is to determine whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." *Id*. "Plain errors are those that are evident, obvious, and clear." *Id*. "In the absence of such a determination, an appellate court should decline to review for plain error." *Id*. "If plain error is found on the face of the claim, then the court may proceed to the second step to determine whether the claimed error resulted in manifest injustice or miscarriage of justice." *Id*.

**Analysis**

In her sole point on appeal, Ybarra argues the trial court erred in overruling her second severance motion and in failing to sever the trial of her case from that of Co-Defendant. Ybarra states that she was charged with 13 counts either singly or jointly with Co-Defendant, the State called 28 witnesses and introduced 614 exhibits during its case-in-chief, the State's evidence was not simple and entailed multiple experts to explain the complexities for the jury, and that the number and type of counts alleged meant the jury could not readily distinguish the evidence and apply it to each offense without confusion.

10

Ybarra claims that she made a particularized showing of prejudice that the joinder of her trial with Co-Defendant resulted in bias or discrimination against her.

"Courts traditionally favor joint trials." *Mack*, 624 S.W.3d at 452 (internal quotation marks omitted). "Joint trials play a vital role in the criminal justice system." *Id*. (internal quotation marks omitted). They "serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability— advantages which sometimes operate to the defendant's benefit." *Id*. (internal quotation marks omitted). "A motion to sever is appropriate only where there is a serious risk of compromise of the defendant's rights or the jury's ability to make a reliable judgment about guilt or innocence." *Id*.

"Rule 24.06 and Section 545.880 govern the propriety and procedure of severing joint trials."[3] *Id*. "Rule 24.06 states that co-defendants must be tried separately only if the court finds the probability of prejudice exists or, *inter alia*, a separate trial is necessary to a fair determination of whether the defendant is guilty." *Id*. "Similarly, Section 545.880.2 requires separate trials only when the trial court finds the probability for prejudice to one defendant in a joint trial." *Id*. (internal quotation marks omitted). "Section 545.880.2(4) directs that the trial court shall find the probability for prejudice exists if a separate trial of a co-defendant is necessary to achieve a fair determination of guilt or innocence of any defendant." *Id*. at 452-53 (internal quotation marks omitted).

---

[3]  All rule references are to the Missouri Supreme Court Rules (2020), unless otherwise indicated.  All statutory references are to RSMo (2016) as updated, unless otherwise indicated.

11

"The purpose of severance is to protect defendants in joint trials from being convicted on evidence that would be inadmissible against them in a separate trial." *Id*. at 453 (internal quotation marks omitted). "Severance is required when the proof is such that a jury could not be expected to compartmentalize the evidence as it relates to the separate defendants." *Id*. (internal quotation marks omitted). "Although it is the duty of the trial court to sever the trials of co-defendants if there are irreconcilable defenses, the doctrine is limited to those cases where the jury will infer that the conflict alone demonstrated that both are guilty." *Id*. "Severance is not required when a less drastic course, such as the provision of proper jury instructions, will prevent prejudice to the defendant." *Id*.

Ybarra cites *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) for the proposition that "[t]here are cases in which the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice." This is not such a case. Ybarra's argument on appeal fails to demonstrate that the trial court abused its discretion in failing to sever, let alone that plain error exists.

Ybarra was charged with thirteen counts (eight counts singly and three counts jointly with Co-Defendant) while Co-Defendant was charged with five counts (two counts singly and three counts jointly with Ybarra). The two counts where Co-Defendant was charged singly involved sexual acts aimed at Child during which Ybarra was present. *See, e.g., State v. Merrill*, 990 S.W.2d 166, 174 (Mo. App. W.D. 1999) ("It is a long

12

recognized principle in Missouri that when two people act in concert in committing an offense, the acts of either individual, in furtherance of that offense are admissible.").

The jury in this case was instructed to consider the case against each defendant separately. *See Mack*, 624 S.W.3d at 453 ("Juries are presumed to follow the instructions given to them; consequently, the trial court did not abuse its discretion in finding that severance was not required to ensure Appellant's right to a fair determination of his guilt."). The jury was also instructed that several exhibits were only to be considered in the case against Ybarra and not against Co-Defendant. The jury was not given an instruction that some exhibits were only to be considered in the case against Co-Defendant and not against Ybarra.

With respect to Count I, the jury convicted Ybarra on a lesser included offense of second degree murder while convicting Co-Defendant of first-degree murder. Further, the three counts the jury acquitted on were counts asserted against Ybarra. *See State v. Chambers*, 234 S.W.3d 501, 509 (Mo. App. E.D. 2007) ("The jury's decision to acquit a defendant of one count, while convicting him of the other counts is indicative of the jury's ability to distinguish evidence and apply the law to each count separately.").

Finally, we note that Ybarra filed a motion to sever her case from Co-Defendant's case but she did not file a motion to sever some of the counts against her from other counts against her. A separate trial against only Ybarra would have been as lengthy and complex as the joint trial.

Ybarra's claim fails under both abuse of discretion and plain error review.  The point is denied.

## Conclusion

The judgment is affirmed.

_____
Anthony Rex Gabbert, Chief Judge


All concur.